RECEIVED
IN MONROE, LA

AUG 2 6 2005
AC
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

**RODNEY TUREAUD** | **CIVIL ACTION NO. 03-2253**

**VERSUS** | **JUDGE ROBERT G. JAMES**

**GRAMBLING STATE UNIVERSITY** | **MAG. JUDGE JAMES D. KIRK**

# RULING

This lawsuit was brought by Plaintiff Rodney Tureaud ("Tureaud") against his former employer, Grambling State University ("GSU").[1] Tureaud contends that GSU violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), by terminating him in retaliation for his attempt to hire a white applicant as assistant police chief. Tureaud contends that GSU's actions regarding his termination also constitute intentional infliction of emotional distress under state law. Finally, Tureaud contends that he was improperly denied payment for accrued leave in violation of Louisiana's Wage Payment law, La. Rev. Stat. § 23:632.

On June 24, 2005, GSU filed a Motion for Summary Judgment [Doc. No. 20], alleging that all Tureaud's claims fail as a matter of law. After an extension of time, Tureaud filed his Opposition to Motion for Summary Judgment on July 29, 2005.

For the following reasons, GSU's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

## I. Facts and Background

GSU is an historically black university located in Grambling, Louisiana. In the fall of 2002,

[1]Grambling State University is operated through the Louisiana Board of Trustees for Colleges and Universities.

GSU was in its words, at "a very important crossroad." GSU was about to undergo its periodic accreditation review.

On October 2, 2002, GSU hired Tureaud as its police chief. Although he had never worked with a university police department, he had more than twenty years of law enforcement experience with the U.S. Customs Service. As chief, Tureaud was responsible for the entire department, including the management of the office, officer training, law enforcement, and the interactions of the department with all facets of the university and with the public. Tureaud was aware of the problems at GSU when he was hired and described the university as being in a state of "disarray."

The position of police chief was unclassified, and Tureaud served in an "at-will" capacity. The lieutenants, sergeants, and police investigators whom he supervised were all classified employees subject to the requirements of the Louisiana Civil Service system. Upon his hiring, Tureaud was provided a copy of rules applicable to unclassified employees and a separate set of Civil Service rules.

In 2003, Tureaud sought and obtained approval from GSU to create the unclassified position of assistant police chief. In the spring of that year, he began recruiting and hiring personnel to fill two sergeant positions and the assistant police chief position. Although GSU's handbook for unclassified employees required a search committee to be appointed for any unclassified administrative positions, Tureaud sought to fill the assistant police chief position himself. He received four applications and interviewed each of the applicants. He determined that one of the applicants was not qualified because he was informed that the applicant had previously left his employment with GSU. He also determined that two of the applicants, both black males, were more suitable for the available sergeant positions. Tureaud selected the remaining applicant, Wesley

Harris ("Harris"), a white male, for the position of assistant police chief. In addition to Tureaud, Harris was interviewed by two or three persons (although these persons were not employed by GSU).

In a May 13, 2003 memorandum, Tureaud recommended to Vice-President of Student Affairs Dr. Ruby Higgins ("Higgins") that Harris be hired as assistant police chief and the other two applicants, Rodney Jones ("Jones") and Greg Clement ("Clement"), be hired as sergeants. Higgins agreed to process the paperwork recommending the hiring of Jones and Clement for the classified sergeant positions, but refused to process the personnel action form for the hiring of Harris. Harris had signed the form before it was submitted, and Higgins told Tureaud that an applicant is not permitted to sign the form before the other required signatures were on the form. Tureaud sent Harris's form to Higgins a second time, completed as he thought she wanted, but she returned it unprocessed. At some point, Tureaud told Higgins, "when you stop being mad at me, please sign the form [hiring Harris]."

The human resources department was responsible for verifying that all hiring procedures were followed for classified positions. Higgins was responsible for ensuring that the hiring procedures were followed for unclassified positions. Higgins determined that these procedures had not been followed in the selection of Harris as assistant police chief because no search committee had been formed.[2] However, according to Tureaud, Higgins never told him that he had failed to follow proper hiring procedures.[3] Even at the time of his deposition for this lawsuit, Tureaud

---

[2]This is the only procedure that GSU mentions in its facts, although it later submits the testimony of Higgins that "there were people who had been denied the right to apply and interview." Doc. No. 20, Exhibit C, at 66-67.

[3]Higgins contends that she did tell Tureaud of his failure to follow procedure, but the Court views the evidence in the light most favorable to Tureaud at the summary judgment stage.

thought that he was to follow the Civil Service rules when attempting to hire someone to fill the assistant police chief position.

The human resources department later determined that Tureaud had not followed Civil Service rules in the selection of Clement and Jones for the sergeant positions. To date, neither the sergeant positions nor the assistant police chief position has been filled.

Prior to his termination, Tureaud discussed his desire to hire Harris with Dr. Angela Weaver ("Weaver"), the Executive Assistant to the President of GSU. Weaver (who sat right outside the President's Office), expressed dissatisfaction with Tureaud's attempt to hire Harris because Harris was formerly employed by the Ruston Police Department. She expressed her view that the Ruston Police Department was "racist" and said that GSU students had issues or problems with the department. According to Tureaud, she asked why Tureaud could not just hire a black applicant and train him for the position. Tureaud explained that he needed Harris because of his experience.

To justify its decision to terminate Tureaud, GSU also recounts certain other incidents. First, then-GSU President Neari Warner ("Warner") counseled him for making inappropriate statements to the media. Tureaud commented about a candidate for the position of chief of police for the Town of Grambling. Higgins spoke with him about the way his arrest of a student was perceived by the GSU student body. (The arrest became the subject of an article in the student newspaper). The student had refused to cooperate with police by providing his identification. That same morning, the student had allegedly become angry with Higgins and used foul language towards her. On another occasion, a GSU employee complained that Tureaud was "rude" in a presentation Tureaud made to the interdepartmental council. Tureaud admits that he "may have cursed" once or twice in the presentation, but only to emphasize that he would not allow employees or anyone else to steal from

from GSU, as had happened in the past. GSU also says that a local doctor complained that Tureaud had not been cooperative and had made inappropriate comments about an employee who was on worker's compensation leave. Although Tureaud agrees that he spoke with the doctor, he denies that his comments about the employee were inappropriate. A female employee complained that he had physically harassed her, and Tureaud admitted that he "pok[ed] her with a rubber antennae." Finally, following the May graduation, Tureaud intended to arrest a GSU student who was trying to find another student in the graduation group. Higgins was leaving the ceremony with Warner in a campus police car, learned of the imminent arrest, and instructed Tureaud that he was not to arrest the student. GSU did not provide any other information about the student's behavior or why the arrest was inappropriate, other than its public relations concerns.

In May 2003, Higgins recommended that GSU terminate Tureaud. Tureaud's termination was effective June 3, 2003. At the time of his termination, Tureaud had earned 536.50 hours of compensable leave time for which he has not been paid.

On July 28, 2003, Tureaud filed a charge of discrimination with the EEOC. A notice of right to sue issued, and Tureaud timely filed this lawsuit on December 9, 2003.

## II. Law and Analysis

### A. Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material

fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B. Retaliation Claim**

Title VII prohibits an employer from taking retaliatory action against an employee who opposes any unlawful employment practice or who has participated in an investigation, proceeding or hearing under that statute. 42 U.S.C. § 2000e-3(a). In order to state a prima facie case of retaliation under Title VII, Tureaud must show that (1) he engaged in an activity protected by law; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407-408 (5th Cir. 1999). The causal link required by the third prong of the prima facie case does not rise to the level of a "but for" standard. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation omitted). "Protected activity is defined as opposition to any practice rendered unlawful by

Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir. 2002) (citing 42 U.S.C. § 2000e-3(a) (2001)).

If the plaintiff is able to establish his prima facie case, then the burden of production shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action. *Id.*

Finally, if the defendant satisfies its burden of production, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. *Id.*

GSU contends that Tureaud cannot meet his prima facie burden because he did not engage in an activity protected by Title VII. GSU admits that Tureaud attempted to hire Harris, a white male, as assistant police chief, but contends that he did not engage in protected activity because he failed to comply with the rules for hiring unclassified employees, particularly that a search committee be formed. Additionally, GSU points out that Tureaud never made a formal complaint or filed a grievance regarding the Harris incident.

In response, Tureaud argues that Higgins refused to process the personnel action form for Harris, and that he was "advised that . . . he should try to find a black applicant that he could train to fill the position." Doc. No. 25, at 4. Tureaud contends that when he persisted in his efforts to hire Harris he was terminated.

The Court finds that Tureaud has met his initial prima facie burden. When Tureaud attempted to hire a white male in an administrative position at GSU, an historically black university, he was immediately met with resistance. First, he was told that the payroll action form was improperly signed by Harris before other signatures were obtained. However, when he re-submitted the form without Harris's signature, Higgins refused to process it again. He contends that he was never told, prior to

his termination, that he had failed to follow hiring procedures. Instead, Weaver, the Executive Assistant to the President of GSU, told him that, instead of hiring Harris, a white police officer who had been employed by what she viewed as a "racist" police department, he should hire a black applicant and train the applicant for the assistant police chief position. The Court further notes the close timing of approximately three months between Tureaud's first attempt to have Harris's payroll action form processed and the time he was terminated. *See Swanson v. Gen. Servs. Admin.* 110 F.3d 1180, 1188 (5th Cir.1997) (Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation."). Under these circumstances, the Court finds that Tureaud has raised a genuine issue of material fact for trial whether he engaged in protected activity and whether that activity had a causal connection to his subsequent termination.

GSU contends, however, that even if Tureaud could meet his prima facie burden, he has failed to present sufficient evidence to survive summary judgment. GSU has produced legitimate, nondiscriminatory reasons for Tureaud's termination: that he failed to follow the procedures required in hiring an assistant police chief, coupled with "the many other concerns [GSU] had regarding [Tureaud] in the areas of complaints against him and public relations." Doc. No. 20, at 12. Therefore, the Court must determine whether Tureaud has presented a genuine issue for trial as to whether GSU's reasons were pretext for retaliation.

The Court finds that Tureaud has met his burden of demonstrating pretext as well. While GSU states that Tureaud failed to follow the procedures required for hiring an assistant police chief, Tureaud contends that he was never told this information prior to his termination. Further, although there is no direct evidence that Weaver took part in or influenced the decision to terminate Tureaud's

employment, the Court cannot ignore the statements made by Weaver, a person who worked directly with the President of GSU, that Tureaud should hire a black applicant. Finally, the list of incidents GSU now points to as justifications for Tureaud's termination were not so significant to warrant any personnel action until after Tureaud continued with his attempt to hire Harris for the assistant police chief position.

GSU's Motion for Summary Judgment on Tureaud's claim of retaliatory discharge is DENIED.

### C. Punitive Damages

The Court finds that GSU is correct that a governmental entity or political subdivision is not subject to punitive damages under Title VII. Title 42, Section 1981a(b)(1) provides as follows:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, governmental agency or political subdivision) if the complaining party demonstrates the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference.

Accordingly, Tureaud's claim for punitive damages under Title VII is DISMISSED WITH PREJUDICE.

### D. Intentional Infliction of Emotional Distress Claim

GSU has also moved for summary judgment on Tureaud's intentional infliction of emotional distress claim, contending that it has Eleventh Amendment immunity to suit and that the claim does not rise to the level required for recovery of damages. Tureaud has not opposed summary judgment on this claim.

While the Court agrees with GSU that it appears to be immune from suit in federal court on this claim, regardless, Tureaud's allegations do not rise to the level required for recovery of damages. In *White v. Monsanto*, 585 So.2d 1205 (La. 1991), the Louisiana Supreme Court held that an action for intentional infliction of emotional distress is viable under Louisiana law. The Supreme Court

explained:

> One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> Thus, in order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*Id.* at 1209-10 (internal citations omitted). The mere fact of termination alone, even if for unlawful reasons, is not sufficient to constitute the type of outrageous conduct required for a finding of liability. *See, e.g., Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1144 (5th Cir. 1991) ("We agree . . . that more is required to prove intentional infliction of emotional distress than the usual ADEA claim.") (quoting *Dean v. Ford Motor Co.*, 885 F.2d 300 (5th Cir. 1989)).

In this case, examining the totality of the circumstances, the Court concludes that the alleged actions of GSU are not sufficiently extreme or outrageous to state a claim for intentional infliction of emotional distress.

Moreover, Tureaud has no evidence that he suffered the severe emotional distress necessary to prevail on such a claim at trial. From the years 2000-2005, he has never been treated by a psychiatrist, therapist, or counselor, and he has not been prescribed any medications for the treatment of any mental illness or injury. He admits that GSU's actions did not result in any emotional or mental harm that required treatment. While he does take medication to treat hypertension, he was taking such medication before and after his employment with GSU.

Tureaud has failed to establish a genuine issue of fact for trial on his claim of intentional

infliction of emotional distress, and GSU's Motion for Summary Judgment on this claim is GRANTED.

**E. Wage Payment Claim**

Tureaud also asserts a wage payment claim under Louisiana law[4] for amounts allegedly due to him for accrued compensatory leave. Louisiana Rev. Stat. § 23:631(A)(1)(a), provides:

> Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or not later than fifteen days following the date of discharge, whichever occurs first.

Accrued leave time is included in the definition of wages owed under La. Rev. Stat. § 23:631. *Kelly v. Caldwell Parish Sch. Bd.*, 32,082 (La. App. 2 Cir. 8/18/99); 740 So.2d 783, 835.

Louisiana Rev. Stat. § 23:632 provides for penalties when an employer does not comply with § 23:631. The employer is liable to the employee for the lesser of either ninety days' wages at the employee's daily rate of pay, or for full wages from the time the employee's demand for payment is made until the employer pays or tenders the amount due. La. Rev. Stat. § 23:632. The employer is also liable for attorney's fees.

GSU does not raise any arguments defending against the factual allegations of Tureaud's wage payment claim, but, instead, contends that, as an arm of the State, it is entitled to sovereign immunity. In support of its argument, GSU cites the Court generally to *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), a Supreme Court case discussing the states' Eleventh Amendment

---

[4]Contrary to GSU's statement that "it is not clear what law Plaintiff is seeking a remedy under," Tureaud asserted a wage claim only under state law, not the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. *See* Amended Complaint (designating his "Second Cause of Action" as a "Louisiana wage claim").

immunity from suit in federal courts.

In response, Tureaud cites the Court to La. Rev. Stat. § 13:5106, asserting that the State, including an arm of the State such as GSU, has made itself amenable to suit in state court.

In *Stafford v. City of Baton Rouge*, 403 So.2d 733 (La. 1981), the Louisiana Supreme Court addressed the issue of whether La. Rev. Stat. § 23:631 was applicable to governmental employers. The Supreme Court stated as follows:

> [W]e . . . [find] no compelling reason to relieve a governmental employer from the statutory obligation imposed on all employers to pay wages to an employee immediately upon discharge or termination. The employees of governmental agencies need their wages upon cessation of employment just as urgently as the employees of individuals or of private corporations . . . Furthermore, the Legislature . . . . has not seen fit to distinguish between governmental and private employers in imposing the obligation upon employers to pay immediately the wages due upon cessation of employment. We decline to imply that the Legislature intended such a distinction, and we have not been shown any rational basis for a constitutional classification if the Legislature did intend to distinguish between employers.

*Id.* at 734. Thus, the Court agrees with Tureaud that GSU is not immune from suit in state court under La. Rev. Stat. §§ 23:631-632. However, that determination does not resolve the issue of whether GSU has Eleventh Amendment immunity in federal court.

The Eleventh Amendment to the United States Constitution bars suits in federal court by citizens of a state against their own state. *Delahoussaye v. City of New Iberia*, 937 F.2d 144, 146 (5th Cir. 1991). In *Delahoussaye*, the plaintiff brought suit against the University of Southwestern Louisiana,[5] a state university. Applying a six-factor test, the *Delahoussaye* Court determined that the university was an arm of the State entitled to Eleventh Amendment immunity. Citing to La. Rev. Stat. § 13:5106, the same statute cited by Tureaud, the Fifth Circuit ruled that Louisiana "has not

[5]The University of Southwestern Louisiana was re-named the University of Louisiana at Lafayette in 1999.

given an express waiver of immunity from suit under the Eleventh Amendment." *Id.* at 147. Therefore, the plaintiff could not bring suit against the university in federal court.

In this case, the Court need not apply the *Delahoussaye* factors because Tureaud admits that GSU is an arm of the State of Louisiana. Accordingly, it is entitled to Eleventh Amendment immunity. While it certainly appears to the Court that Tureaud is entitled to judgment on his wage payment claim, the Court has no choice but to dismiss this remaining claim without prejudice to his right to re-file in state court.

**III. Conclusion**

For the foregoing reasons, GSU's Motion for Summary Judgment [Doc. No. 20] is GRANTED IN PART AND DENIED IN PART. GSU's Motion for Summary Judgment is GRANTED on Tureaud's intentional infliction of emotional distress claim under state law, and that claim is DISMISSED WITH PREJUDICE. GSU's Motion for Summary Judgment is also GRANTED on Tureaud's wage payment claim under La. Rev. Stat. § 23:631, *et seq.*, and that claim is DISMISSED WITHOUT PREJUDICE to his right to re-file in state court. However, GSU's Motion for Summary Judgment is DENIED on Tureaud's claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

MONROE, LOUISIANA, this 26 day of August, 2005.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE